IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

DAKOTA NELSON;
BELINDA BIAFORE, individually and as
Chairperson of the West Virginia Democratic Party;
ELAINE A. HARRIS, individually and as
Chairperson of the Kanawha County Democratic Executive Committee;
WEST VIRGINIA DEMOCRATIC PARTY; and
WEST VIRGINIA HOUSE LEGISLATIVE COMMITTEE,

                Plaintiffs,

v.                                              CIVIL ACTION NO.   3:19-0898

MAC WARNER in his official capacity as
West Virginia Secretary of State; and
VERA MCCORMICK, in her official capacity as
Clerk of Kanawha County, West Virginia, and all
ballot commissioners for the state of West Virginia,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

This suit challenges the constitutionality of a West Virginia law mandating that ballots for partisan offices list first the party whose candidate for president received the most votes in the last election. The defendants now move for summary judgment on the grounds that the plaintiffs lack standing and that this suit involves a nonjusticiable political question. Unpersuaded by these arguments, the Court **DENIES** the defendants' motions.

**I. BACKGROUND**

West Virginia's "Ballot Order Statute" mandates:

> The party whose candidate for president received the highest number of votes at the last preceding presidential election is to be placed in the left, or first column, row or page, as is appropriate to the voting system. The party which received the second

> highest vote is to be next and so on. Any groups or third parties which did not have a candidate for president on the ballot in the previous presidential election are to be placed in the sequence in which the final certificates of nomination by petition were filed.

W. Va. Code § 3-6-2(c)(3). Election officials have interpreted "highest number of votes" to refer to votes in West Virginia, not nationwide. ECF No. 7 ¶ 2 n.1. Thus, ballots for the upcoming 2020 general election will list Republican Party candidates first because a majority of West Virginians voted for Donald Trump in 2016. The plaintiffs, all of whom are affiliated with the Democratic Party, allege a growing body of social science and case law confirms that candidates listed first on a ballot benefit from a bias known as the "primacy effect." ECF No. 7 ¶ 3. The plaintiffs therefore argue the Ballot Order Statute is unconstitutional because it arbitrarily gives candidates from one party an advantage over candidates from other parties. *Id.* ¶¶ 1–2. Count One alleges the Ballot Order Statute is an undue burden on the right to vote in violation of the First and Fourteenth Amendments. *Id.* ¶¶ 36–42. And Count Two alleges the Statute constitutes disparate treatment in violation of the Fourteenth Amendment's Equal Protection Clause. *Id.* ¶¶ 43–47. The plaintiffs ask the Court to declare the Ballot Order Statute unconstitutional, enjoin the defendants from enforcing it, and require the defendants to use a ballot ordering system that gives similarly situated major-party candidates an equal opportunity for the ballot to list them first. *Id.* at 17.

Among the plaintiffs are three individuals. Dakota Nelson was a 2018 Democratic candidate for District 16 of the West Virginia House of Delegates. ECF No. 1-2, at 4. Because of the Ballot Order Statute, the ballot listed him after three Republican candidates. *Id.* Nelson ran for District 16 again in the June 2020 primary and will appear on the November 2020 general election ballot.[1] ECF No. 58-3, at 13:24–14:04. Belinda Biafore is a registered voter in Marion County,

---

[1] The plaintiffs did not submit evidence of the June primary election results, but the Court takes judicial notice that Nelson won third place in the Democratic primary for District 16, so he will be one of three Democratic candidates for District 16 on the November 2020 ballot. *See Historical Election Results and Turnout*, SECRETARY OF

West Virginia, and she is Chairman of the West Virginia Democratic Party. ECF No. 58-2, at 10:16–18, 35:15–16. She regularly supports and votes for Democratic candidates. *Id.* at 16:14–18, 34:18–21, 36:04–06. Elaine Harris is a lifelong Democrat who is active in politics and regularly votes for Democrats. ECF No. 58-1, at 10:10–18, 23:04–07.

The plaintiffs also include two organizations. The West Virginia Democratic Party is comprised of elected Democratic officials, candidates, and tens of thousands of registered Democrats who support the party. ECF No. 58-2, at 12:24–13:19. It recruits and supports Democratic candidates across the state. *Id.* at 15:06–21, 16:14–18, 19:04–20:20. The West Virginia Democratic House Legislative Committee is made up of all elected Democrats in the West Virginia House of Delegates. ECF No. 58-5, at 17:12–21. The Legislative Committee uses its resources to recruit and support Democratic candidates for elected office. *Id.* at 20:03–06, 23:11–24:01.

Now pending are motions for summary judgment from defendants Secretary of State Mac Warner and Clerk of Kanawha County Vera McCormick. ECF Nos. 56, 58. The Secretary of State argues all of the individual and organizational plaintiffs lack standing to bring this suit. ECF Nos. 59, 69. McCormick also argues the plaintiffs lack standing and makes the additional argument that summary judgment is warranted because the plaintiffs' challenge to the Ballot Order Statute involves a nonjusticiable political question. ECF Nos. 57, 73. Oral argument occurred on July 13, 2020. ECF No. 84. For the reasons below, the Court finds standing exists and the political question doctrine does not bar the Court from adjudicating the plaintiffs' claims. The Court therefore denies the defendants' motions for summary judgment.

---

STATE MAC WARNER, https://sos.wv.gov/elections/Pages/HistElecResults.aspx (last visited July 14, 2020).

## II. DISCUSSION

**A.  Nelson, the Democratic Party, and the Legislative Committee have direct standing.**

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). To prove standing, a plaintiff must "present [1] an injury that is concrete, particularized, and actual or imminent; [2] fairly traceable to the defendant's challenged behavior; and [3] likely to be redressed by a favorable ruling." *Id.* (citation omitted). The first element requires "an invasion of a legally protected interest which is [both] concrete and particularized . . . [and] actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). The second element requires showing a "causal connection between the injury and the conduct complained of" such that the injury is "not . . . the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (citation omitted). The third element requires it to be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (citation and internal quotation marks omitted). This three-part inquiry applies to organizational plaintiffs as well as individuals. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (citations omitted).

The party invoking the court's jurisdiction bears the burden of establishing the elements of standing. *Lujan*, 504 U.S. at 561 (citations omitted). That party must support each element "with

the manner and degree of evidence required at the successive stages of the litigation." *Id.* (citations omitted). Therefore, in response to a motion for summary judgment, the plaintiff can no longer rest on "mere allegations" but "must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotation marks omitted). If the opposing party controverts these facts at the final stage of litigation, the facts must be "supported adequately by the evidence adduced at trial" for the party to maintain standing. *Id.* (citation omitted).

### 1. Injury-in-Fact

#### a. Nelson demonstrated an injury based on his harmed electoral prospects.

"The inability to compete on an equal footing due to the application of allegedly biased criteria has been recognized in many contexts as an injury in fact sufficient to support constitutional standing." *Nat. Law Party of U.S. v. Fed. Elec. Comm'n*, 111 F. Supp. 2d 33, 44 (D.D.C. 2000) (collecting cases); *e.g. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding contractors had standing to challenge city ordinance based on "inability to compete on an equal footing in the bidding process"); *see also Fulani v. Brady*, 935 F.2d 1324, 1327 (D.C. Cir. 1991) (collecting cases) (explaining that courts have recognized "competitor standing" in "circumstances where a defendant's actions benefitted a plaintiff's competitors, and thereby caused the plaintiff's subsequent disadvantage"). The D.C. Circuit explained so-called "competitive standing" this way: "when regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests (e.g., retention of elected office) in that environment suffer legal harm under Article III." *Shays v. Fed. Elec. Comm'n*, 414 F.3d 76, 87 (D.C. Cir. 2005).

Several circuits have extended this competitive standing theory to elections, holding that a candidate and his or her party can show an injury-in-fact if the defendant's actions harm the candidate's chances of winning. *See, e.g., Green Party of Tenn. v. Hargett*, 767 F.3d 533, 538 (6th Cir. 2014) (holding Green Party and Constitution Party had standing to challenge state's ballot access and ballot order statutes); *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011) (explaining that the "potential loss of an election" was an injury-in-fact sufficient to give a local candidate and party officials supporting that candidate standing); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587–88 (5th Cir. 2006) (holding party demonstrated injury of "harm to its election prospects" and "threatened loss of political power" and candidate demonstrated injury because the opposing party's actions "threaten[ed] his election prospects"); *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir. 1990) (holding third party and its candidates faced the injury of "increased competition" when the defendants allegedly improperly placed major-party candidates on the ballot); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (holding the "well-established concept of competitors' standing" gave Conservative Party representative standing because the party "stood to suffer a concrete, particularized, actual injury—competition on the ballot from candidates that . . . were able to 'avoid complying with the Election Laws' and a resulting loss of votes"); *see also Pavek v. Simon*, No. 19-CV-3000 (SRN/DTS), 2020 WL 3183249, at *12–14 (D. Minn. June 15, 2020) (holding two Democratic Party committees had standing to challenge a ballot order statute based on an injury to their electoral prospects); *Hollander v. McCain*, 566 F. Supp. 2d 63, 68 (D.N.H. 2008) ("[C]ourts have held that a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election."); *Mann v. Powell*, 333 F. Supp.

1261, 1265 (N.D. Ill. 1969) (holding candidates had standing to challenge ballot order statute based on statute's possible threat of discriminatory treatment).

Contrary to this overwhelming precedent, the Secretary of State relies on the recent Eleventh Circuit decision in *Jacobson v. Florida Secretary of State* to argue the claimed injury to Nelson's electoral prospects is too speculative. ECF No. 71, at 9; *see* 957 F.3d 1193 (11th Cir. 2020). The district court in *Jacobson* ruled Florida's ballot order statute violated the First and Fourteenth Amendments because of the primacy effect, but the Eleventh Circuit vacated that decision on the grounds that none of the plaintiffs had standing to bring the suit. 957 F.3d at 1212. The Eleventh Circuit held the plaintiff Democratic National Committee relied "solely on an average measure of the primacy effect," so the Circuit had "no basis to conclude that the primacy effect will impact any particular voter or candidate in any particular election." *Id.* at 1205 (citation omitted). The Democratic National Committee therefore had "not proved that at least one of its unidentified members 'is certain to be injured by' the primacy effect" as required for standing. *Id.* (citing *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1204 (11th Cir. 2018)).

The reasoning in *Jacobson* is inapplicable here, however, because the plaintiffs actually focus the Court's analysis on a particular candidate in a particular election. Nelson bases his injury on the impending impact of the primacy effect in the November election, in which the ballot will list him after three Republican candidates. The plaintiffs' expert, Dr. Jon Krosnick, concludes that "[l]isting a candidate's name first on the ballot almost always accords that person an advantage in gaining votes," and the near universality of this phenomenon makes it "extremely likely" that the primacy effect will impact the November election. ECF No. 62-2, at 2. The Secretary of State argues Dr. Krosnick's use of phrases like "almost always" renders his predictions too speculative. ECF No. 71, at 9. But standing does not "uniformly require plaintiffs to demonstrate that it is

literally certain that the harms they identify will come about." *Clapper*, 568 U.S. at 414 n.5. In cases like this where predictions of human behavior hit epistemological limits, demonstrating a "substantial risk" of injury is sufficient. *Id.*; *Susan B. Anthony List*, 573 U.S. at 158. Based on Dr. Krosnick's expert analysis, the Court easily finds Nelson has demonstrated a substantial risk that the primacy effect will harm his chances of winning in the upcoming election. *See also Pavek*, 2020 WL 3183249, at *13–14 (holding plaintiffs demonstrated an injury-in-fact to challenge Minnesota's ballot order statute based on a substantial risk that the primacy effect will occur in the 2020 general election). He therefore has shown a sufficient injury-in-fact for standing.

### b. The Democratic Party and Legislative Committee also demonstrated an injury based on harm to their candidates' electoral prospects.

As noted above, the unlawful structuring of a competitive election not only injures the disadvantaged candidate, but also the political party supporting that candidate. *See Green Party of Tenn.*, 767 F.3d at 538 (holding third parties had standing to challenge state's ballot access and ballot order statutes); *Drake*, 664 F.3d at 783 (explaining that the "potential loss of an election" can be a sufficient injury-in-fact for party officials); *Tex. Democratic Party*, 459 F.3d at 587–88 (holding party demonstrated injury of "harm to its election prospects" and "threatened loss of political power"); *Fulani*, 917 F.2d at 1030 (holding third party faced injury of "increased competition" when defendants allegedly improperly placed major-party candidates on the ballot); *Schulz*, 44 F.3d at 53 (holding third party representative had standing because the party stood to suffer from "competition on the ballot from candidates that . . . were able to 'avoid complying with the Election Laws' and a resulting loss of votes"); *Pavek*, 2020 WL 3183249, at *12–14 (holding party committees had standing to challenge a ballot order statute based on harm to their electoral prospects); *Hollander*, 566 F. Supp. 2d at 68 (explaining that a "political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so

hurts the . . . party's own chances of prevailing in the election"). The Fifth Circuit explained why in *Texas Democratic Party v. Benkiser*:

> [A] political party's interest in a candidate's success is not merely an ideological interest. Political victory accedes power to the winning party, enabling it to better direct the machinery of government toward the party's interests. While power may be less tangible than money, threatened loss of that power is still a concrete and particularized injury sufficient for standing purposes.

459 F.3d at 587 (citation omitted). Thus, the alleged harm resulting from West Virginia's Ballot Order Statute is not only a sufficient injury-in-fact for Nelson, but also for the Democratic Party and the Legislative Committee because they actively campaign across the state for Democratic candidates like Nelson. ECF No. 58-5, at 20:01–06, 23:11–24:01, 25:07–14.

In disputing the Democratic Party's and Legislative Committee's standing, the Secretary of State again relies on the Eleventh Circuit's decision in *Jacobson.* ECF No. 71, at 11–15. Following the Supreme Court's recent decision in *Gill v. Whitford*, the Eleventh Circuit held an organization's "general interest in its preferred candidates winning as many elections as possible" is only a "generalized partisan preference" that federal courts are "not responsible for vindicating." *Jacobson*, 957 F.3d at 1206 (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018)). The organizational plaintiffs in *Jacobson* thus failed to establish standing because their claimed injury was a "systemic disadvantage to [their] party relative to other political parties" rather than harm to "a particular candidate's prospects in a future election." *Id.* The Eleventh Circuit, however, expressly declined to decide "whether a political party would have standing to challenge an electoral practice that harmed one of *its* candidate's electoral prospects in a particular election." *Id.* (emphasis in original). *Jacobson* is therefore inapplicable here because the Democratic Party and Legislative Committee base their standing on the Ballot Order Statute's harm to *their* candidates, including Nelson, in the upcoming November election. *See Tex. Democratic Party*, 459 F.3d at 586 (holding party had standing to challenge an action that would reduce "its

congressional candidate's chances of victory" in an upcoming election); *Pavek*, 2020 WL 3183249, at \*14 n.13 (holding *Jacobson* did not apply to standing analysis for organizational plaintiffs because the plaintiffs' focused their injury on harm to the plaintiffs' candidates in the upcoming election). As previously discussed, the plaintiffs have established through Dr. Krosnick that a "substantial risk" exists that the Ballot Order Statute will harm the electoral prospects of Nelson and other candidates the Democratic Party and Legislative Committee are running in the November election. This sufficiently demonstrates an injury-in-fact for standing.

### c. The Democratic Party and Legislative Committee did not, however, demonstrate an injury based on diversion of resources.

In *Havens Realty Corporation v. Coleman*, the Supreme Court held that a nonprofit organization dedicated to achieving equal opportunity in housing sufficiently alleged direct standing to sue an apartment complex owner for allegedly unlawful racial steering practices. 455 U.S. 363, 379 (1982). The organization alleged it had "been frustrated by [the] racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and that it had "to devote significant resources to identify and counteract the . . . racially discriminatory steering practices." *Id*. The Supreme Court reasoned that if the steering practices "perceptibly impaired" the organization's ability to provide services to home seekers, "there can be no question that the organization has suffered an injury in fact" because such "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.* (citation omitted). Courts have since reaffirmed that an organizational plaintiff has direct standing if a challenged policy frustrates its purpose *and* causes a diversion of resources. *See, e.g., Md. Shall Issue, Inc. v. Hogan*, No. 18-2474, 2020 WL 3494322, at \*4 (4th Cir. June 29,

2020) (holding allegations that a law "undermined" an organization's mission, without allegations of expended resources as a consequence of the law, are insufficient).

Under this theory of injury, the plaintiffs first argue that the Ballot Order Statute results in fewer elected Democrats which in turn causes lower revenue to the Democratic Party. ECF No. 69, at 10–11. The plaintiffs' only support comes from the testimony of Bates and Biafore who speculated that a different ballot order would result in more elected Democrats and more money. ECF No. 58-5, at 24:07–23; ECF No. 58-2, at 16:20–17:09. This kind of counterfactual speculation is far afield from the requirement that an injury be "concrete and demonstrable." *Havens Realty Corp.*, 455 U.S. at 379. Even more fundamentally, an injury based on the diversion of resources must actually involve the diverting or draining of resources. *See id.*; *Md. Shall Issue, Inc.*, 2020 WL 3494322, at *4 (holding organization lacked standing, in part, because it did not allege it expended resources as a result of the challenged law) (citing *Havens Realty Corp.*, 455 U.S. at 379). The plaintiffs' argument that a different ballot ordering scheme would increase their revenue says nothing of how the plaintiffs expend their existing resources in response to the Statute.

The plaintiffs' second argument is that the Ballot Order Statute affects how the Democratic Party and Legislative Committee expend their resources because the Statute impacts elections' competitiveness. ECF No. 69, at 10–11. For support, the plaintiffs only offer vague testimony from Bates and Biafore that the plaintiffs spend their money based on each race's competitiveness. ECF No. 58-5, at 30:11–17; ECF No. 58-2, at 19:04–19, 32:05–24. This testimony is insufficient because it does not set forth specific facts showing the plaintiffs actually diverted resources from some activities to assist certain candidates as a consequence of the Statute. *See Jacobson*, 957 F.3d at 1206 ("Although resource *diversion* is a concrete injury, neither Kazin nor Cecil explained what activities the Committee or Priorities USA would divert resources away *from* in order to spend

additional resources on combatting the primacy effect, as precedent requires."). The testimony is also inadequate because many conditions other than the Statute shape the competitiveness of an election, and Biafore even testified that factors like who the Democratic candidate is, whether a Republican is running, polling data, and advice from other organizations determine how the plaintiffs allocate their resources across elections. ECF No. 58-2, at 19:04–19, 32:05–24. The plaintiffs' failure to parse out these many factors and show a "concrete and demonstrable" effect by the Statute on their spending renders their argument insufficient at this stage of litigation. *Havens Realty Corp.*, 455 U.S. at 379; *see Lujan*, 504 U.S. at 561 (requiring specific facts be set forth supporting standing at summary judgment and be further supported by adequate evidence at trial). The Democratic Party and Legislative Committee therefore failed to demonstrate an injury based on a diversion of their resources.

**2. Traceability**

Having found that Nelson, the Democratic Party, and the Legislative Committee have demonstrated an injury-in-fact, the Court now turns to traceability. This element of standing requires the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation omitted). As previously discussed, the plaintiffs have sufficiently demonstrated through Dr. Krosnick that the Ballot Order Statute causes the primacy effect to disproportionately benefit Republican candidates, which injures Democratic candidates' electoral prospects. This injury is fairly traceable to the defendant class of ballot commissioners because their statutory duties include preparing the ballots "necessary for conducting every election for public officers in which the voters of the county participate," including all "general, special, and primary elections held in the county or any magisterial district thereof." W. Va. Code §§ 3-1-21(a), 3-1-19(g). They must

also provide the ballots "for any countywide special election ordered by the county commission." W. Va. Code § 3-1-21(b)(2). The plaintiffs' injury is also traceable to the Secretary of State based on his statutory duties. The Eleventh Circuit ruled in *Jacobson* that the alleged injury from Florida's ballot order statute was not traceable to the Secretary of State because she had no role in ordering candidates' names on ballots, but West Virginia requires its Secretary of State to prepare the ballots "for any statewide special election ordered by the Legislature." 957 F.3d at 1207; W. Va. Code § 3-1-21(b)(1). And unlike in *Jacobson* where the Secretary had no control over county supervisors except through coercive judicial process, West Virginia binds its ballot commissioners to "any orders that may be issued and any legislative rules that may be promulgated by the Secretary of State." 957 F.3d at 1207–08; W. Va. Code § 3-1A-6(a). This direct control over ballot commissioners' compliance with state election law, along with the Secretary's own duty to prepare ballots for special elections, make the plaintiffs' injury fairly traceable to him.

### 3. Redressability

Lastly, the plaintiffs must show it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted). The plaintiffs ask the Court to declare the Ballot Order Statute unconstitutional, enjoin the defendants from enforcing it, and require the defendants to use a ballot ordering system that gives similarly situated major-party candidates an equal opportunity for the ballot to list them first. ECF No. 7, at 17. As explained regarding traceability, the Secretary of State and ballot commissioners are responsible under state law for enforcing the Statute, so declaratory and injunctive relief against them would effectively stop implementation of the Statute across West Virginia. *Cf. Jacobson*, 957 F.3d at 1208 (explaining that enjoining the Florida Secretary of State from following Florida's ballot statute would not provide redress because the

Secretary does not enforce the statute and the county supervisors who do enforce it were not joined as parties). If the Court enjoins enforcement of the Statute, the primacy effect will no longer disproportionately harm candidates' electoral prospects based on their party affiliation. And the parties have stipulated that the kind of randomized or rotational ballot ordering that the plaintiffs seek to cure the harm of the Ballot Order Statute is possible with West Virginia's current voting systems. ECF No. 64-1. The Court therefore finds that granting the requested relief would redress the plaintiffs' injury.

### B. The Democratic Party also has associational standing.

In addition to having standing on its own behalf, the Democratic Party has associational standing on behalf of Nelson. *See Tex. Democratic Party*, 459 F.3d at 587–88 (holding the Texas Democratic Party had associational standing on behalf of its candidate). Associational standing for an organization exists when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Democratic Party meets all three requirements. The Court has already determined that Nelson, a member and candidate of the Democratic Party, has standing to sue based on harm to his electoral prospects.[2] *See* ECF No. 58-2, at 12:24–13:19; *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) (citation omitted) ("Associational standing may exist even when just one of the association's members would have standing."). As to the second element, the Democratic Party undoubtedly seeks to protect its organizational interests in this suit. The goal of

---

[2] Nelson is not, however, a member of the Legislative Committee, which includes only Democratic members of the House of Delegates. ECF No. 58-5, at 17:12–15. The plaintiffs did not submit evidence of Legislative Committee members running for reelection in November to support finding associational standing for the Legislative Committee.

a state political party, as explained by the Supreme Court, is to "to gain control of the machinery of state government by electing its candidates to public office." *Storer v. Brown*, 415 U.S. 724, 745 (1974). The Democratic Party seeks here to invalidate a state law that hinders its candidates' competitiveness in state elections. As to the third element, the claims asserted do not require the participation of Nelson or other Democratic Party members, even though Nelson is a separate plaintiff. The Court finds Nelson's candidacy to be a basis for standing in this suit, but the Democratic Party's and Legislative Committee's separate standing makes Nelson unnecessary for this case to proceed. And "[u]nlike a suit for money damages, which would require examination of each member's unique injury, this action seeks a declaratory judgment and injunctive relief, the type of relief for which associational standing was originally recognized." *Retail Indus. Leaders Ass'n*, 475 F.3d at 187. The Democratic Party thus has associational standing to bring this suit.

In sum, the Court concludes Nelson, the Democratic Party, and the Legislative Committee have direct standing based on harm to their electoral prospects. The Democratic Party also has associational standing on behalf of its member Nelson. Having found standing on these grounds, the Court declines to address the plaintiffs' additional argument that Biafore and Harris have individual standing as voters. *See Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

### C. The political question doctrine does not bar this suit.

McCormick also argues this case is not justiciable under the political question doctrine. ECF No. 57, at 12–13; ECF No. 73. This doctrine is "primarily a function of the separation of powers" and operates as "a narrow exception" to the judiciary's general obligation to decide cases

properly before it. *Baker v. Carr*, 369 U.S. 186, 210 (1962); *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (citation omitted). A case or controversy involves a political question "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker*, 369 U.S. at 217).

McCormick relies on the Supreme Court's recent decision in *Rucho v. Common Cause* to argue the ordering of candidates' names on a ballot is a nonjusticiable political question. ECF No. 57, at 12–13; ECF No. 73; 139 S. Ct. 2484 (2019). In *Rucho*, the Court concluded that partisan gerrymandering claims present nonjusticiable political questions because "[f]ederal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." 139 S. Ct. at 2506–07. These claims "inevitably ask the courts to make their own political judgment about how much representation particular political parties *deserve*—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end." *Id.* at 2499.

*Rucho*, however, is a "rare circumstance" where the political question doctrine applies, and its holding narrowly focuses on partisan gerrymandering—"one of the most intensely partisan aspects of American political life." *Id.* at 2508, 2484. The ruling does not extend to other voting rights claims or even other types of gerrymandering claims. The Supreme Court held claims based on the "one-person, one-vote rule" are justiciable because they are "relatively easy to administer as a matter of math." *Id.* at 2501. Claims of population inequality among districts are justiciable because they "could be decided under basic equal protection principles." *Id.* at 2496 (citation omitted). And racial gerrymandering claims are justiciable because they do "not ask for a fair share of political power and influence." *Id.* at 2495–96 (citations omitted). Because "the Supreme Court

indicated that its reasoning was specific to the gerrymandering context," the Eleventh Circuit's majority opinion in *Jacobson* rejected that *Rucho* "compels the conclusion that [the plaintiffs' challenge to Florida's ballot order statute] presents a nonjusticiable political question." 957 F.3d at 1225 n.3.

The Ninth Circuit recently extended the reasoning of *Rucho* to find that a case related to ameliorating climate change was nonjusticiable, but the Ninth Circuit's decision reinforces that *Rucho*'s reasoning applies only to extraordinary cases. *Juliana v. United States*, 947 F.3d 1159, 1173 (9th Cir. 2020). In *Juliana v. United States*, the plaintiffs asked the court to take the colossal step of enjoining the government to cease permitting, authorizing, and subsidizing fossil fuel use and to develop a plan subject to judicial approval for reducing fossil fuel emissions nationwide. *Id.* at 1170. The court explained that "any effective plan would necessarily require a host of complex policy decisions" including, for example, how much to invest in public transit and how quickly to transition to renewable energy. *Id.* at 1171–72. Even if the court delegated these decisions to the executive and legislative branches, the court would still need to judge the sufficiency of the government's plan in remediating the plaintiffs' claimed violation of their right to a "climate system capable of sustaining human life." *Id.* at 1173. Court supervision of government compliance would also last for decades. *Id.* at 1172.

Like congressional districting, reducing fossil fuel emissions on a national scale involves myriad constitutional and policy considerations that make judicial review unmanageable. Ballot ordering, in contrast, involves far fewer variables and is capable of resolution "under basic equal protection principles." *Rucho*, 139 S. Ct. at 2496. The Supreme Court explained in *Rucho* that it had never "struck down a districting plan as an unconstitutional partisan gerrymander, and ha[d] struggled without success over the past several decades to discern judicially manageable standards

for deciding such claims." *Id.* at 2491. But courts have competently adjudicated ballot order cases using equal protection principles for decades. *E.g. McLain v. Meier*, 637 F.2d 1159, 1165–67 (8th Cir. 1980) (holding North Dakota's incumbent-first statute violated equal protection); *Sangmeister v. Woodard*, 565 F.2d 460, 467 (7th Cir. 1977) (affirming that county clerks excluding plaintiffs from top ballot positions violated equal protection); *Netsch v. Lewis*, 344 F. Supp. 1280, 1281 (N.D. Ill. 1972) (holding state law ordering ballot by incumbency and seniority violated equal protection). And for close to thirty years, courts have used the *Anderson/Burdick* test to assess the constitutionality of ballot order statutes "by weighing the severity of the burden the challenged law imposes on a person's constitutional rights against the importance of the state's interests supporting that law." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 713, 721 (4th Cir. 2016) (holding Virginia's three-tiered ballot ordering law did not violate the First and Fourteenth Amendments); *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1282–83 (N.D. Fla. 2019) (holding Florida's ballot order statute violated equal protection), *vacated and remanded sub nom. Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193 (11th Cir. 2020); *Green Party of Tenn. v. Hargett*, No. 3:11-CV-692, 2016 WL 4379150, at *40 (M.D. Tenn. Aug. 17, 2016) (holding plaintiffs failed to prove Tennessee's ballot order statute was unconstitutional)*, aff'd,* No. 16-6299, 2017 WL 4011854 (6th Cir. May 11, 2017); *Graves v. McElderry*, 946 F. Supp. 1569, 1582 (W.D. Okla. 1996) (holding state law listing Democratic candidates first violated equal protection). While not binding on the issue of justiciability, the Supreme Court has even summarily affirmed a district court's decision that favoring incumbents when breaking ties where the state law required ballots to list candidates in the order they filed their nominating petitions was "a purposeful and unlawful invasion of [the] plaintiffs' Fourteenth Amendment right to fair and evenhanded treatment." *Mann v. Powell*, 314 F. Supp. 677, 679 (N.D. Ill. 1969)*, aff'd,* 398 U.S. 955 (1970).

From these cases emerge manageable standards for resolving complaints of partisan advantage based on ballot order. Courts have generally found ballot order statutes that are neutral and nondiscriminatory as to partisan affiliation are constitutional. The Fourth Circuit, for example, concluded that "facially neutral and nondiscriminatory" ballot order laws "impose[ ] only the most modest burdens" on free speech, associational, and equal protection rights and therefore survive under *Anderson/Burdick*. *Libertarian Party of Va.*, 826 F.3d at 717. The Second and Seventh Circuits similarly held neutral and nondiscriminatory ballot order statutes are constitutional. *Koppell v. N.Y. State Bd. of Elections*, 153 F.3d 95, 96 (2d Cir. 1998) (holding state's ordering of candidates by lottery was nondiscriminatory and therefore constitutional); *Sangmeister*, 565 F.2d at 468 (holding county clerks listing their own party's candidates first was unconstitutional and ordering the defendants to implement an alternative "neutral in character"). Courts have generally determined that a nondiscriminatory ballot order is one that ensures major-party candidates, if not all candidates, have an equal chance of being listed first. *See McLain*, 637 F.2d at 1169 (stressing "the constitutional requirement that position advantage must be eliminated as much as is possible" and explaining the optimal solution is "some form of ballot rotation whereby 'first position' votes are shared equitably by all candidates"); *Pavek*, 2020 WL 3183249, at *30 (ordering the Secretary of State "to adopt a procedure under which Minnesota's four current major political parties are assigned, by lot, a single statewide ballot order"); *Mann*, 314 F. Supp. at 679 (ordering the "drawing of candidates' names by lot or other nondiscriminatory means by which each of such candidates shall have an equal opportunity to be placed first on the ballot")*, aff'd,* 398 U.S. 955 (1970). While some variation exists in how courts assess the constitutionality of ballot ordering and how courts remedy unconstitutional statutes, this variation is not so unmanageable as to render the issue nonjusticiable. And in contrast to the proposed standard in *Rucho* involving a

mathematical comparison to a baseline election map, these standards are "relatively easy to administer." 139 S. Ct. at 2501.

Like many others before it, this case tasks the Court with using familiar First and Fourteenth Amendment principles to determine whether granting an electoral advantage to a candidate based on partisan affiliation violates equal protection and unduly burdens the fundamental right to vote. Although requiring "hard judgments," courts are capable of measuring the "character and magnitude" of such a burden against a state's claimed interests. *Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983). The Court finds nothing in *Rucho* to suggest the Supreme Court intended to insulate election laws like West Virginia's Ballot Order Statute from judicial review, and the Court concludes *Rucho* is inapplicable here. While this case presents a political issue with significant political consequences, it is not a "rare circumstance" presenting a nonjusticiable political question. *Rucho*, 139 S. Ct. at 2508. The *Anderson/Burdick* test and decades of precedent addressing ballot order provide the Court with an adequate framework to adjudicate the plaintiffs' claims.

### III. CONCLUSION

For these reasons, the Court concludes the plaintiffs have standing to bring this suit and the political question doctrine does not bar it. Accordingly, the Court **DENIES** the defendants' motions for summary judgment, ECF Nos. 56, 58. The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to all counsel of record.

ENTER: July 15, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE