**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 20-1860**

───────────────

DAKOTA NELSON; BELINDA BIAFORE, individually and as Chairperson of the
West Virginia Democratic Party; ELAINE A. HARRIS, individually and as
Chairperson of the Kanawha County Democratic Executive Committee; WEST
VIRGINIA DEMOCRATIC PARTY; WEST VIRGINIA DEMOCRATIC HOUSE
LEGISLATIVE COMMITTEE,

        Plaintiffs - Appellees,

    v.

MAC WARNER, in his official capacity as West Virginia Secretary of State,

        Defendant - Appellant,

    and

VERA MCCORMICK, in her official capacity as Clerk of Kanawha County, West
Virginia and all county ballot commissioners for the state of West Virginia,

        Defendant.

------------------------------

STATE OF TEXAS; STATE OF GEORGIA; STATE OF ARIZONA: STATE OF
FLORIDA: STATE OF INDIANA; STATE OF OKLAHOMA: HONEST
ELECTIONS PROJECT,

        Amici Supporting Appellant.

───────────────

**No. 20-1861**

───────────────

DAKOTA NELSON; BELINDA BIAFORE, individually and as Chairperson of the West Virginia Democratic Party; ELAINE A. HARRIS, individually and as Chairperson of the Kanawha County Democratic Executive Committee; WEST VIRGINIA DEMOCRATIC PARTY; WEST VIRGINIA DEMOCRATIC HOUSE LEGISLATIVE COMMITTEE,

        Plaintiffs - Appellees,

    v.

VERA MCCORMICK, in her official capacity as Clerk of Kanawha County, West Virginia and all county ballot commissioners for the state of West Virginia,

        Defendant - Appellant,

    and

MAC WARNER, in his official capacity as West Virginia Secretary of State,

        Defendant.

-------------------------------

STATE OF TEXAS; STATE OF GEORGIA; HONEST ELECTIONS PROJECT; STATE OF ARIZONA; STATE OF FLORIDA; STATE OF INDIANA; STATE OF OKLAHOMA,

        Amici Supporting Appellant.

---

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Robert C. Chambers, District Judge.  (3:19−cv−00898)

---

Argued:  May 7, 2021                Decided:  September 1, 2021

---

Before WYNN and THACKER, Circuit Judges, and KEENAN, Senior Circuit Judge.

---

Vacated and remanded by published opinion.  Senior Judge Keenan wrote the majority opinion, in which Judge Thacker joined.  Judge Wynn wrote a dissenting opinion.

---

**ARGUED:**  Lindsay Sara See, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellant.  Anthony J. Majestro, POWELL & MAJESTRO PLLC, Charleston, West Virginia, for Appellees.  **ON BRIEF:**  Patrick Morrisey, Attorney General, Curtis R.A. Capehart, Deputy Attorney General, Jessica A. Lee, Assistant Solicitor General, Thomas T. Lampman, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellant Mac Warner.  Michael W. Taylor, BAILEY & WYANT, PLCC, Charleston, West Virginia, for Appellant Vera McCormick.  Christina L. Smith, POWELL & MAJESTRO PLLC, Charleston, West Virginia, for Appellees.  Thomas R. McCarthy, Cameron T. Norris, Alexa R. Baltes, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, for Amicus Honest Elections Project.  Ken Paxton, Attorney General, Jeffrey C. Mateer, First Assistant Attorney General, Brent Webster, First Assistant Attorney General, Kyle D. Hawkins, Solicitor General, Todd Lawrence Disher, Deputy Chief, Special Litigation Unit, William T. Thompson, Special Counsel, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas.  Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona.  Ashley Moody, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF FLORIDA, Tallahassee, Florida, for Amicus State of Florida.  Christopher M. Carr, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia.  Curtis T. Hill, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana.  Mike Hunter, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma.

----

BARBARA MILANO KEENAN, Senior Circuit Judge:

The plaintiffs in this case are individuals and organizations affiliated with the West Virginia Democratic Party.  They challenge as unconstitutional a West Virginia statute governing the order in which candidates' names appear on state election ballots.  Under West Virginia Code § 3-6-2(c)(3) (the ballot-order statute, or the statute), election ballots for partisan state and federal elections are organized for each contest by listing first the candidates affiliated with the political party whose candidate for President of the United States received the most votes in West Virginia in the most recent presidential election. Therefore, during the four-year period following a presidential election, those candidates' names always appear on such ballots above the names of candidates affiliated with other political parties.  The plaintiffs contend that because candidates appearing first on the ballot "almost always" receive an increased vote share based solely on this priority status, this system favors candidates based on their political affiliation and violates the plaintiffs' rights under the First and Fourteenth Amendments.

Before addressing the merits of the plaintiffs' argument, the district court rejected certain jurisdictional challenges raised by the defendants, including that the plaintiffs lacked standing and that the complaint presented a nonjusticiable political question.  After conducting a bench trial, the court agreed with the plaintiffs on the merits of their claim, declaring that the statute violated their rights under the First and Fourteenth Amendments.

Upon our review, we conclude that the district court properly asserted subject matter jurisdiction over the case.  We hold that (1) an individual plaintiff, who was a Democratic candidate for state office, alleged an injury-in-fact and satisfied the other criteria for

4

standing, and (2) that we may consider the lawfulness of the statute despite its partisan context.

We disagree, however, with the district court's ultimate conclusion that the statute is unconstitutional.  Our decision in *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 714, 717-18 (4th Cir. 2016), makes clear that a ballot-order statute, which provides a neutral rule for listing candidates' names on the ballot, does not violate the Constitution even though the statute may impair a candidate's ability to attract "the windfall vote" in an election.  Generally, such a statute places at most a modest burden on free speech and equal protection rights.  And nothing in the present record demonstrates that the West Virginia ballot-order statute imposes a greater burden on those rights.  We therefore hold that the ballot-order statute is neutral and nondiscriminatory in its application, and that any modest burden imposed by the statute on the plaintiffs' rights is justified by the state's important interests in promoting voting efficiency and in reducing voter confusion and error.  We therefore vacate the district court's judgment and remand the case to the district court for entry of an order dismissing the complaint.

I.

Since its enactment in 1991, the ballot-order statute has governed the order in which candidates for partisan elections appear on ballots in West Virginia.  The statute states that "[t]he party whose candidate for president received the highest number of votes [in the

state][1] at the last preceding presidential election" is entitled to have its candidates listed first on the ballots.[2]  W. Va. Code § 3-6-2(c)(3).  Voters in West Virginia favored the Democratic nominee for president in 1988, 1992, and 1996, and favored the Republican nominee for president in 2000, 2004, 2008, 2012, 2016, and 2020.[3]  Accordingly, since the statute's first application 30 years ago, Democratic candidates were listed first on the ballot for ten years, while Republican candidates have been listed first since that time. Republican candidates also will be listed first for the next three years based on the results of the 2020 presidential election.

The plaintiffs challenged the constitutionality of the statute in a complaint filed in December 2019 against Mac Warner, the West Virginia Secretary of State, who serves as the state's chief election official; and Vera McCormick, clerk of Kanawha County and a representative member of all West Virginia Ballot Commissioners (the defendants).[4]  The plaintiffs include two organizations, the West Virginia Democratic Party and the West

---

[1] West Virginia election officials have interpreted the statute's reference to the presidential candidate who received "the highest number of votes," as referencing the candidate favored by West Virginia voters, rather than by the country as a whole. Additionally, the West Virginia Code provides that within each party's list of candidates, when more than one candidate for office will be elected, the candidates' names will be drawn by lot for ballot-order placement.  W. Va. Code § 3-6-2(d)(2).

[2] A prior version of the statute allowed the Secretary of State the discretion to determine ballot order, but the statute recommended ordering candidates in the manner described in the current statute.  W. Va. Code § 3-6-2 (1990).

[3] *See* 270 To Win, *West Virginia*, https://www.270towin.com/states/West_Virginia (timeline of West Virginia presidential voting history) (last accessed July 6, 2021).

[4] The plaintiffs filed an amended complaint in January 2020 which serves as the operative complaint in this case.

Virginia Democratic House Legislative Committee, which both filed suit on behalf of themselves and their members.  The plaintiffs also include three individuals who are all registered voters in West Virginia: (1) Belinda Biafore, the Chairperson of the West Virginia Democratic Party; (2) Elaine Harris, Chairperson of the Kanawha County Democratic Executive Committee; and (3) Dakota Nelson, a Democratic candidate in 2018 and 2020 for the West Virginia House of Delegates, District 16.  Nelson ultimately was unsuccessful in both those contests.

The plaintiffs based their claim on the ballot order's "primacy effect," which occurs when candidates who are listed first on the ballot receive "windfall" votes based solely on their ballot position.  *See Alcorn*, 826 F.3d at 714; *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1242 (11th Cir. 2020) (describing this effect as "positional bias").  The plaintiffs contended that the statute unduly burdens both the individual and organizational-member plaintiffs' right to vote, in violation of the First and Fourteenth Amendments, by decreasing the impact of their votes and by making it more difficult to elect Democratic Party candidates who disproportionately have been placed in a disfavored position on the ballot. The plaintiffs also alleged that the statute violates their rights under the Equal Protection Clause of the Fourteenth Amendment, because the statute treats candidates differently based on their partisan affiliation and gives the favored party "an unfair and arbitrary electoral advantage."  Based on these claims, the plaintiffs asked the district court: (1) to declare that the statute is unconstitutional; (2) to enter an injunction barring application of the statute; and (3) to enter an order requiring the state to enact ballot-placement legislation

that gives similarly situated major-party candidates an equal opportunity to be listed first on the ballot.

The defendants filed motions for summary judgment on the grounds that the plaintiffs lacked standing, and that the complaint presented a nonjusticiable political question.  The district court denied the defendants' motions.

After rejecting the defendants' jurisdictional challenges, the district court conducted a bench trial.  Nelson and representatives of the organizational plaintiffs testified that the ballot-order statute reduced their chances of electing candidates affiliated with the Democratic Party, including Nelson, by placing those candidates in a disfavored position on the ballot.  The plaintiffs primarily relied on testimony from their expert witness, Dr. Jon Krosnick, a political psychologist, who conducted a statistical regression analysis of West Virginia elections that informed his testimony about ballot-order placement and its resulting primacy effect over the last 50 years.  According to Dr. Krosnick, voters who lack information about candidates and who are undecided about which candidate to support are more inclined to choose the candidate listed first on the ballot above other candidates running for the same office.

Based on his statistical analysis, Dr. Krosnick concluded that this primacy effect is 80 to 85 percent likely to apply in each West Virginia election, including in multi-candidate elections.  He further testified that the best scientific estimate of the primacy effect is a vote share advantage of 2.94 percent for the top-listed candidate.  Dr. Krosnick explained that, in a two-candidate race, the opponent of the top-listed candidate would be placed at a disadvantage by having that same amount subtracted from the total vote that he or she could

receive.  Dr. Krosnick thus opined that two-candidate elections decided by a margin of fewer than 5.88 percentage points would have yielded a different result if the other candidate had been listed first on the ballot.

According to Dr. Krosnick, between 1960 and 2018, at least 105 election results in West Virginia were decided within the margin described above.[5]  And, in those elections, the result "would have changed" if the order of listing the candidates' names had been reversed.[6]  Dr. Krosnick identified 15 Democratic candidates and 31 Republican candidates, since 1991, who were listed second on the ballot and had won their elections by a margin less than the primacy effect percentage of the vote share.  Dr. Krosnick explained that these results likely fell short of the actual number of affected elections in West Virginia, because he did not include certain partisan elections for which he lacked adequate data.[7]  Notably, since the statute was enacted in 1991, no presidential race in West

---

[5] Dr. Krosnick's finding rested on an earlier primacy effect calculation of 2.425% of the vote share, smaller than his later amended figure of a 2.94%.

[6] Dr. Krosnick only analyzed races for these offices: President, U.S. Senator from West Virginia, U.S. Representative in a West Virginia district, West Virginia State Senator, representative in the West Virginia House of Delegates, West Virginia Secretary of State, West Virginia Attorney General, West Virginia Commissioner of Agriculture, and state Circuit Court judges.

[7] These figures likely also fell short of the number of affected elections because they were based on a primacy effect calculation of 2.425% of the vote share rather than the 2.94% figure ultimately adopted by Dr. Krosnick and the district court.

Virginia has been decided by a margin in which the primacy effect would have affected the outcome.[8]

The defendants presented testimony from Donald Kersey, the General Counsel for the West Virginia Secretary of State, who described the state's interests promoted by the ballot-order statute. Kersey explained that the practice of listing candidates consistently on the ballot by party affiliation allows for a number of benefits, including the efficient administration of elections and a reduction in voter confusion and errors made by voters.

Additionally, the defendants presented testimony from an expert witness, Dr. Jason MacDonald, a professor of political science who engaged in a quantitative research analysis regarding the primacy effect. Using a different model than the one developed by Dr. Krosnick, Dr. MacDonald concluded that the primacy effect in West Virginia elections has resulted in an average impact of 1.606 percent of the vote share. According to Dr. MacDonald, application of this lower number only would have altered the outcome of 64 of the 105 affected races identified by Dr. Krosnick.

At the conclusion of the trial, the district court found Dr. Krosnick's methodology and analysis more credible, reasonable, and reliable than the methods and analysis employed by Dr. MacDonald. Crediting Dr. Krosnick's testimony in full, the court held that the statute burdened the individual plaintiffs' right to vote by diluting votes for

---

[8] *See* 270 To Win, *West Virginia*, https://www.270towin.com/states/West_Virginia (timeline of West Virginia presidential voting history) (last accessed July 6, 2021). Dr. Krosnick identified only one presidential election result in West Virginia that would have been altered if the opposing party had been listed first, namely, the presidential election in 1980.

candidates not placed in the lead position on the ballot.  The court further concluded that the statute interfered with the plaintiffs' ability to participate equally in elections by discriminating against candidates based on party affiliation.

Describing these burdens as "significant," "substantial," and not "modest," the district court observed that the primacy effect had been "outcome-determinative in dozens of elections, significantly shaping West Virginia politics."  The court concluded that the state's interests were not "sufficiently weighty" to justify the burdens imposed by the statute, and did not support using partisan criteria over another basis for determining ballot order.

Based on these conclusions, the district court permanently enjoined the defendants from issuing ballots in conformity with the ballot-order statute.  The court also ordered the defendants to "implement a ballot ordering system that comports with the United States Constitution . . . until the West Virginia legislature" could adopt alternative legislation.

The defendants appealed from the district court's judgment in August 2020. Because the general election in November 2020 was fast-approaching, the defendants also filed a motion asking that the injunction be stayed pending appeal.  We granted the defendants' motion.

II.

A.

On appeal, the defendants begin with two arguments challenging the district court's failure to dismiss the case for lack of subject matter jurisdiction.  The defendants contend

11

(1) that none of the plaintiffs established standing to bring the present action, and (2) that the plaintiffs' complaint presents a nonjusticiable political question.

We first address the defendants' argument that the plaintiffs lacked standing to bring the present suit.  The defendants contend that none of the plaintiffs demonstrated that the ballot-order statute injured them in a concrete, particularized manner.  According to the defendants, the "diluted chance of partisan success" and the unequal opportunity to benefit from the primacy effect are not injuries in fact because the evidence showed only an "average primacy effect," rather than an impact on any particular election.  The defendants further maintain that the plaintiffs' injury is not redressable by a ruling in their favor unless the Democratic Party always is listed first on the ballot.  We disagree with the defendants' position.

Article III of the Constitution provides that federal courts may consider only "[c]ases" and "[c]ontroversies."  U.S. Const. art. III, § 2, cl. 1.  To establish an injury sufficient to confer standing to bring suit under Article III, a plaintiff must show: (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  These requirements for standing ensure that the plaintiff has "a personal stake in the outcome of the controversy."  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Regarding the first element of standing, a plaintiff's "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations

12

omitted). To establish such an injury, the plaintiff must show that "there is a 'realistic danger' that" the plaintiff "will 'sustain[ ] a direct injury' as a result of the" challenged provision. *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 241 (4th Cir. 2019) (alteration in original) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Notably, when one plaintiff establishes standing to bring the claims, such a showing is sufficient for the court to invoke jurisdiction over the suit. *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020).

In *Gill v. Whitford*, the Supreme Court addressed whether a group of voters had standing to bring certain partisan gerrymandering claims based on the alleged impact on the plaintiffs' right to vote. 138 S. Ct. at 1929-31. In a typical partisan gerrymander, a state's legislative districts purposefully are designed to "waste" an individual's vote in a district where the voter's chosen candidate likely would win or likely would lose by wider margins. *Id.* at 1930-31. The plaintiffs in *Gill* alleged an injury by arguing that the partisan gerrymander caused their votes to "carry less weight" than they would have carried in a hypothetical district that had not been gerrymandered. *Id.* at 1931. But, in stating their claim, the plaintiffs relied on evidence of "statewide injury to Wisconsin Democrats" and an "average measure" of "partisan asymmetry." *Id.* at 1932-33. The Supreme Court held that this average measure was not sufficiently particular to an individual or to a certain district to allege a cognizable injury in fact. *Id.* at 1933-34.

Relying in part on this analysis, the Eleventh Circuit rejected a claim by voters and organizations supporting the Democratic Party, who maintained that a Florida statute gave unfair advantage to the Republican Party by placing first on the ballot candidates of the

party that most recently won the gubernatorial election.  *Jacobson*, 974 F.3d at 1246-48.

The court in *Jacobson* held that the voters failed to establish standing because they "failed to prove that they have suffered or will suffer partisan vote dilution in any particular election."  *Id.* at 1248.  The court observed that the plaintiff organizations likewise failed to identify a member who would be injured by the Florida statute.  *Id.* at 1249.  Thus, the court compared the suit to the facts and circumstances in *Gill*, concluding that the dispute presented questions of "generalized partisan preferences" instead of individual legal rights. *Id.* at 1248, 1250-51.

Here, however, the plaintiffs included Nelson, a West Virginia voter who was a Democratic candidate for state office at the time the complaint was filed in the district court.  By virtue of the statute's application, in both 2018 and 2020, Nelson's name appeared on the ballot as one of three Democratic candidates for the West Virginia House of Delegates, District 16, and was listed beneath the three Republican candidates.  This ballot placement deprived Nelson of any benefit from the windfall vote, allegedly injuring his chances of being elected.

When the complaint was filed, Nelson already had lost his 2018 race, but had alleged an impending injury due to the primacy effect in the then-upcoming November 2020 election.  Although Nelson has since lost his 2020 race, his claim has not been rendered moot.  *See N.C. Right to Life Comm. Fund for Indep. Pol. Expenditures v. Leake*, 524 F.3d 427, 435 (4th Cir. 2008) (explaining that a losing candidate's challenges to election rules were not mooted by occurrence of the election, based on a reasonable expectation that the challenged provisions would apply in a future election).  Thus, the present case included

an alleged injury to an identified candidate for office and his attempt to be elected.  This alleged injury to Nelson presented more than a generalized allegation of partisan harm, even though his claim rested on the broadly applicable calculation of primacy effect and the frequency of its occurrence.  Given the expert testimony credited by the district court that it was extremely likely that the primacy effect would have a negative impact on Nelson's vote tally, we hold that Nelson showed a substantial risk of injury that was particular and concrete.[9]  *Lujan*, 504 U.S. at 560.

We also conclude that Nelson's claims are fairly traceable to the defendant's conduct and that they are redressable by a favorable ruling.  Nelson's injury is traceable to the defendant Vera McCormick, a representative of the ballot commissioners executing the statutory duties of preparing ballots in accordance with the ballot-order statute.  *See* W. Va. Code §§ 3-1-21(a), 3-1-19(g).  Nelson's injury also is traceable to the defendant, Mac Warner who, as West Virginia Secretary of State, is charged with preparing the ballots for statewide special elections.  *See* W. Va. Code § 3-1-21(b)(1).

Finally, Nelson's alleged injury is redressable based on his request that we declare the statute unconstitutional and enjoin its application.  Although Nelson ultimately seeks a ballot-order statute that provides an equal opportunity for political parties to be listed first on the ballot each year, a judicial declaration that the present statute is unconstitutional would eliminate application of the present statute and would provide redress from the

---

[9] Based on our conclusion, we do not reach the question whether the so-called doctrine of competitive standing, on which the district court relied, is applicable in a case challenging a statute directing the order of listing partisan candidates for elective office on a statewide election ballot.

15

statute's allegedly injurious effects.  *See Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 285 (4th Cir. 2018) ("The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability.").  We therefore conclude that Nelson has established standing to assert the plaintiffs' claims.  *See Md. Shall Issue, Inc.*, 971 F.3d at 210.

## B.

The defendants argue, nevertheless, that the plaintiffs' claims raise a nonjusticiable "political question," which barred the district court from asserting subject matter jurisdiction.  According to the defendants, the plaintiffs effectively sought the court's assistance to allocate "fairly" the partisan advantages arising from the primacy effect.  The defendants maintain that this type of court involvement is prohibited under the Supreme Court's decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).  We disagree with the defendants' position.

The political question doctrine is a "function of the separation of powers," and prevents federal courts from deciding issues that the Constitution assigns to the political branches, or that the judiciary is ill-equipped to address.  *Baker*, 369 U.S. at 217; *see also Tiffany v. United States*, 931 F.2d 271, 276 (4th Cir. 1991) (stating that the constitutional separation of powers "requires that we examine the relationship between the judiciary and the coordinate branches of the federal government cognizant of the limits upon judicial power").  The Supreme Court has defined the term "political question" by reference to whether a case presents certain "attributes," including an absence of "judicially

16

discoverable and manageable standards for resolving" the case.[10]  *Baker*, 369 U.S. at 210, 217.

Critically, in our decision in *Libertarian Party of Virginia v. Alcorn*, a ballot-order case that we discuss in detail below, we had no difficulty resolving the case on the merits by discerning analytical standards for reviewing the plaintiffs' claim that Virginia's ballot-order statute violated the First and Fourteenth Amendments.  826 F.3d at 713, 716.  We evaluated the merits of the plaintiffs' constitutional challenges to Virginia's ballot-order statute under the *Anderson/Burdick* analytical framework articulated by the Supreme Court.  *Id.* at 713, 716 (first citing *Burdick v. Takushi*, 504 U.S. 428 (1992); then citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983)).  We held that Virginia's three-tiered system for listing candidates imposed "little burden" on the plaintiffs' rights and was justified by Virginia's important interests that the statute protected.  *Id.* at 719-21.

Our consideration of the merits of the plaintiffs' ballot-order claim in *Alcorn* and our application of the *Anderson/Burdick* framework in that case compel the conclusion that the political question doctrine does not bar us from considering the plaintiffs' ballot-order challenges to the West Virginia statute.  Like the plaintiffs in *Alcorn*, the plaintiffs here

---

[10] A political question also may present the following additional attributes: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;" (2) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;" (3) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;" (4) "an unusual need for unquestioning adherence to a political decision already made;" or (5) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."  *Baker*, 369 U.S. at 217.  None of these other attributes is at issue in this case.

challenge a state statute that allegedly impacts the right to vote and provides other candidates an unequal opportunity to gain the windfall vote based on their partisan affiliation. Accordingly, the plaintiffs' claims in the present case can be analyzed by applying the "manageable standards" of the *Anderson/Burdick* framework. *See Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020) (per curiam) (rejecting application of the political question doctrine in challenge to Minnesota's ballot-order statute listing first candidates whose political party earned fewer votes in the prior presidential election); *see also Mann v. Powell*, 398 U.S. 955 (1970) (necessarily rejecting assertion of political question doctrine by summarily affirming injunction against ballot order scheme that awarded incumbents the first position on the ballot).

Our conclusion is not altered by the defendants' reliance on the Supreme Court's decision in *Rucho*, which issued four years after *Alcorn*. *Rucho*, 139 S. Ct. 2484. In *Rucho*, voters in two states challenged their states' congressional districting maps as unconstitutional partisan gerrymanders. *Id.* at 2491. The Court held that these claims presented nonjusticiable political questions because "judges have no license to reallocate political power between the two major political parties," with no constitutional grant of authority to do so and "no legal standards to limit and direct their decisions." *Id.* at 2506-07. The Court explained that the "central problem" is determining when political gerrymandering "has gone too far," a measurement too difficult to undertake in an adjudicative context. *Id.* at 2497 (citation omitted).

Nothing about the Court's language, however, suggests that the holding in *Rucho* is applicable outside the context of partisan gerrymandering claims. *Id.* (explaining that

18

partisan gerrymandering claims are "more difficult to adjudicate" than other election-related challenges including racial gerrymandering and violations of the one-person, one-vote principle); *see Baten v. McMaster*, 967 F.3d 345, 352 (4th Cir. 2020) (declining to expand *Rucho* to a challenge of a winner-take-all system for appointing presidential electors).  Nor does *Rucho* call into question use of the *Anderson/Burdick* framework, even though application of the test necessarily explores the acceptable degrees of burden imposed on voters' constitutional rights.  We therefore reject the defendants' attempt to reformulate the plaintiffs' claims to fall within *Rucho*'s reach.

As we already have stated, the question before us is whether West Virginia's ballot-order statute improperly burdens the plaintiffs' rights under the First and Fourteenth Amendments.  Courts regularly evaluate and adjudicate disputes regarding the lawfulness of state statutes, including ballot-order statutes, and nothing about the Supreme Court's decision in *Rucho* alters our ability to do so.  *See Alcorn*, 826 F.3d at 718-19; *see also Pavek*, 967 F.3d at 907 (addressing the merits of a ballot-order claim and holding that the court "comfortably" had employed judicially manageable standards in adjudicating such claims in the past (citing *McLain v. Meier*, 637 F.2d 1159, 1165-67 (8th Cir. 1980)); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 551 (6th Cir. 2014) (addressing on the merits a claim that ballot-order statute "denied an equal opportunity to exercise [plaintiffs'] rights to association and political expression" and remanding for factual determination of the scope of the influence a party's or candidate's position on the ballot has on voter behavior); *Koppell v. N.Y. State Bd. of Elections*, 153 F.3d 95, 96 (2d Cir. 1998) (per curiam) (affirming denial of preliminary injunction to bar ballot-order statute invoking a lottery and

rotational system because all candidates treated in nondiscriminatory manner); *Bd. of Election Comm'rs of Chi. v. Libertarian Party of Ill.*, 591 F.2d 22, 25-27 (7th Cir. 1979) (holding that a two-tier system, with candidates of two major parties appearing first and second on ballot and all other candidates following, did not violate the Constitution absent showing of "intentional or purposeful discrimination").  We therefore conclude that the political question doctrine does not bar consideration of the merits of this case.

## C.

Addressing the merits of their appeal, the defendants argue that the district court erred in declaring the ballot-order statute unconstitutional.  The defendants rely on our decision in *Alcorn*, contending that the ballot-order statute imposes at most a modest burden on the plaintiffs' rights.  826 F.3d 708.  The defendants further contend that, contrary to the district court's conclusion, the statute is not discriminatory because it allows an equal opportunity for partisan candidates to be listed first on the ballot and to obtain the benefit of the primacy effect.

In response, the plaintiffs maintain that *Alcorn* does not control the outcome of this case.  In support of their argument, the plaintiffs rely on the evidence that, due to the primacy effect in West Virginia's partisan elections, "the outcome of every election in which the first-listed candidate won by a margin of less than 5.88 percentage points would have been different had the other major party been listed first instead."  Thus, according to the plaintiffs, the magnitude of this burden imposed on their rights is significant. Additionally, although the plaintiffs acknowledge that the ballot-order statute does not automatically place a certain political party in the first position on the ballot, the plaintiffs

20

contend that the statute is not neutral in its application.  We disagree with the plaintiffs' arguments.

Initially, we discuss in some detail our decision in *Alcorn*, which is central to our analysis in this case.  As noted above, in *Alcorn*, we addressed challenges to a Virginia ballot-order statute, including that the statute was unconstitutional because it allegedly deprived certain classes of candidates an opportunity to gain the "windfall vote."  *Id.* at 714.

The Virginia statute at issue, Virginia Code § 24.2-603, placed candidates in partisan elections on the ballot in three "tiers" based on their party affiliation.  *Id.* at 712. The top tier on the ballot included candidates affiliated with political parties that received at least 10 percent of the vote share for any statewide office in the last two elections.  *See* Va. Code §§ 24.2-101, 24.2-603(C).  Only the Republican and Democratic Parties satisfied these conditions when the suit was filed.  *Alcorn*, 826 F.3d at 712 (citing Va. Code § 24.2-101).  The second tier of candidates on the ballot were those affiliated with other "recognized political parties," as defined by the Virginia Code, which at the time included the Libertarian Party.  *Id.* (citing Va. Code § 24.2-603).  And the third tier of candidates on the ballot included those candidates not associated with a political party whose candidates were listed in the upper two tiers.  *Id.*  Within each tier, candidates were placed on the ballot by lot.  *Id.*

The *Alcorn* plaintiffs, who included candidates affiliated with the Libertarian Party and one independent candidate, alleged claims much like the claims before us.  *Id.* at 712-13.  They asserted (1) that the statute unduly burdened their rights under the First

Amendment, including the right to cast a vote for a candidate of their choice, and (2) that the statute violated the Equal Protection Clause of the Fourteenth Amendment by preventing certain candidates from having equal access to the top tier on the ballot.[11]  *Id.* at 714.  Addressing the substance of their claims, we affirmed the district court's dismissal of their complaint under Rule 12(b)(6) before allowing the parties to conduct discovery. *Id.* at 711-12, 721.

In considering the *Alcorn* plaintiffs' arguments, we applied the Supreme Court's *Anderson/Burdick* analytical framework, which directs courts to analyze constitutional "challenges to state election laws by weighing the severity of the burden the challenged law imposes on a person's constitutional rights against the importance of the state's interests supporting that law."  *Id.* at 713 (first citing *Burdick*, 504 U.S. 428; then citing *Anderson*, 460 U.S. 780).  We addressed the burden that the Virginia statute placed on the plaintiffs' rights under the First and Fourteenth Amendments and observed that the statute "merely allocates the benefit of positional bias, which places a [minimal] burden on the right to vote."  *Id.* at 718 (citation omitted).  We explained that the Virginia statute applied the same rules to all political parties for obtaining placement on the ballot in the three tiers and that, accordingly, the statute allocated the "positional bias" in a neutral, nondiscriminatory manner.  *Id.* at 717-18.

We further observed in *Alcorn* that even if the plaintiffs had been permitted to introduce evidence establishing a primacy effect, such a claim based on a "windfall vote

---

[11] Notably, we did not question the *Alcorn* plaintiffs' standing to bring these claims or otherwise address our jurisdiction to review the case.

theory" would have failed "to raise an inference of any cognizable constitutional burden on First or Fourteenth Amendment rights." *Id.* at 718-19.  We emphasized that when a statute is neutral in its application, "[a]ccess to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern." *Id.* at 719 (citation omitted).  Although this language did not ultimately form the basis for the Court's holding in *Alcorn*, it nonetheless is persuasive in our consideration of the factual circumstances of the present case.

After making these observations in *Alcorn*, we proceeded to analyze Virginia's stated interests in the statute under the *Anderson/Burdick* framework.  *Id.* at 719-21.  We concluded that, among other reasons, the state's interests in reducing voter confusion and in listing partisan candidates for offices by political party (party-order symmetry) justified "the most modest burdens" on the plaintiffs' rights.  *Id.* at 717, 719-20.  Accordingly, we concluded that the plaintiffs had failed to state a claim that the Virginia statute was unconstitutional.  *Id.* at 721.

Our decision in *Alcorn* made plain that regardless whether the plaintiffs could demonstrate "the exact degree of positional bias" caused by Virginia's statute, this type of bias resulting from ballot-order placement placed a lesser burden on the plaintiffs' rights under the First and Fourteenth Amendments than other sorts of ballot-related concerns.  *Id.* at 716-19.  For example, the burden imposed by positional bias pales in comparison to the burdens imposed by statutes affecting an individual's ability to cast a vote, a candidate's ability to appear on a ballot, or the rights of individuals to associate in political organizations.  *Id.* at 717.

23

Here, the plaintiffs presently are denied their preferred method of ballot ordering and will be subject to the detriment of the primacy effect until at least the year after the next presidential election.  While we have concluded for standing purposes that the plaintiffs alleged a substantial risk of injury based on the primacy effect, any burden imposed by the statute is not elevated from a "modest" to a "significant" burden even under Dr. Krosnick's quantification of the primacy effect.  As noted above, according to Dr. Krosnick, the primacy effect usually generates windfall votes for the first-listed candidate. However, the ballot-order statute allocates this positional bias on a neutral basis.  *See Alcorn*, 826 F.3d at 716-19.  Because the statute is neutral in its application, the statute affords the major political parties an equal ability to access the benefit of the windfall vote. Just as in *Alcorn,* in which the minor political parties could qualify for the top tier if they satisfied the requirements of the statute, *id.* at 717, here, both Democrats and Republicans have an equal opportunity every four years to obtain the most votes in West Virginia for their presidential candidates.

Indeed, nothing in the record demonstrates, nor have the plaintiffs argued, that the primacy effect has altered the result of any presidential election in West Virginia in the last 30 years.  The ballot-order statute's reliance on presidential election results has not undermined either party's ability to attempt to "reset" the benefit of the primacy effect every four years.  Thus, nothing in this record demonstrates that the statute and the resulting windfall vote burden the plaintiffs on a discriminatory, partisan basis.  Instead, the plaintiffs' burden is primarily attributable to voters in West Virginia favoring one party's

24

presidential candidate over another, and a partisan change in the outcome of future presidential elections in West Virginia will eliminate the plaintiffs' injury.[12]

Based on our conclusion that the statute imposes at most a "modest" burden on the plaintiffs' rights, we easily conclude that any such burden is justified by the state's "important regulatory interests." *Alcorn*, 826 F.3d at 719 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). A "state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. In short, "[t]his is not a high bar," and we conclude that West Virginia has articulated reasonable justifications akin to those advanced in *Alcorn*. 826 F.3d at 719.

As the plaintiffs readily acknowledge, one party's candidates must be placed first on an election ballot. Here, the ballot-order statute aids the voting process by reducing voter confusion and by increasing voting efficiency based on the use of party-order symmetry in listing candidates on the ballot. According to Kersey, party-order symmetry on election ballots aids voters in quickly identifying and selecting their preferred

---

[12] We decline to accept the plaintiffs' implicit suggestion that the statute is discriminatory on a partisan basis because the statute fails to give political parties equal access each year to placement at the top of the ballot. We are not aware of any court that has invalidated a ballot-order statute on this basis.

We also emphasize that our holding today rests on the record before us including the factual findings made by the district court. Thus, to the extent that our dissenting colleague hypothesizes about the impact of a much larger vote share comprising the primacy effect, namely, 15 percentage points, that question simply is not presented. *See* Dissent Op. at 34. Furthermore, nothing in our decision today declares that any type of ballot-related claim is "wholly off limits" irrespective of the facts presented. *Id.*

candidates.   Kersey also testified that the statute permits the effective and efficient administration of an election, which process the district court found was simple and easily implemented across the state.   Although West Virginia could have devised a different ballot-order regime that also achieved these benefits, the state was not required to do so or to show that its chosen method was the least burdensome means of allocating the primacy effect because any modest burden imposed by the ballot-order statute was justified by the state's important regulatory interests.   *See Anderson*, 460 U.S. at 788; *Pavek*, 967 F.3d at 908-09.

Accordingly, based on the record before us, we conclude that any modest burden imposed by the neutrally applied statute was justified by West Virginia's important regulatory interests.   We therefore hold that the district court erred in awarding judgment to the plaintiffs on their constitutional claims and in declaring the ballot-order statute unconstitutional.

III.

For these reasons, we vacate the district court's judgment and remand the case for entry of an order dismissing the plaintiffs' complaint.

*VACATED AND REMANDED*

WYNN, Circuit Judge, dissenting:

As a matter of fact, there is a decided advantage to being listed at the top of an election ballot. And on every ballot, in every race, some candidates will be listed above the rest. A few states draw order by lot. Others use the alphabet. But in West Virginia, the candidates from the political party that got the most votes in the last presidential election are always listed first.[1] That's not only unfair to the voters in West Virginia, it's unconstitutional.

The problem is that West Virginia's ballot-order statute gives the state's dominant political party a multi-percentage-point head start on its opponents. Seemingly benign election rules can put an undemocratic thumb on the scale; sometimes a whole hand. The district court found that to be the case here. And it rightly determined that, as a constitutional matter, the State's interests in cost-savings and ballot-symmetry don't outweigh the veritable political advantage that the ballot-order statute confers. Because my colleagues reach the opposite conclusion, I must dissent.[2]

---

[1] *Compare, e.g.*, Ark. Code § 7-5-207(c)(1), *and* N.C. Gen. Stat. § 163-165.6(c), *with* W. Va. Code § 3-6-2(c)(3).

[2] Much ink has been spilled over whether the federal judiciary can decide this case at all. But to me, the answer is emphatically, "Yes." At least one Plaintiff—the candidate, Dakota Nelson—has standing: His disfavored place on the ballot gives us an injury. That injury is fairly traceable to the actions of Defendants Vera McCormick and Mac Warner, who are responsible for preparing ballots. A declaration that the ballot-order statute is unconstitutional (and a corresponding injunction) would provide redress. And the fact that Nelson has not yet indicated whether he will run for office in 2022 does not moot his claims. *Stop Reid v. FEC*, 814 F.3d 221, 232 (4th Cir. 2016).

This case is also justiciable: Federal courts have competently evaluated ballot-order challenges for decades. *Anderson/Burdick* provides a tested, manageable framework. And (Continued)

I.

Pursuant to the framework established in *Anderson* and *Burdick*, we "review First and Fourteenth Amendment-based challenges to state election laws by weighing the severity of the burden the challenged law imposes on a person's constitutional rights against the importance of the state's interests supporting that law." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 713 (4th Cir. 2016) (citing *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983)).

There is no "litmus test for measuring the severity of a burden that a state [election] law imposes." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality opinion). Rather, the *Anderson/Burdick* inquiry is a "flexible" one that "requires 'hard judgments'—it does not dictate 'automatic' results." *Alcorn*, 826 F.3d at 716 (quoting *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789–90). We do have some guideposts. "Severe" burdens are subject to a form of strict scrutiny,[3] whereas "modest" burdens are "usually justified by the state's important regulatory interests." *Id.* at 717 (quotation marks omitted). But the ultimate question is always the same: Are the state's asserted interests

---

as the majority rightly explains, *Rucho v. Common Cause*—the "rare circumstance" in which the political-question doctrine applied, 139 S. Ct. 2484, 2508 (2019)—imposes no barrier to jurisdiction here. So, as to the threshold issues of standing and justiciability, my colleagues and I are in complete agreement.

[3] I agree with the district court that, while significant, the leg up afforded by West Virginia's ballot-order statute is not "severe" enough to warrant strict scrutiny. *Nelson v. Warner*, 477 F. Supp. 3d 486, 511 (S.D. W. Va. 2020). As we explained in *Alcorn*, "the class of laws facing [strict] scrutiny is limited" to those that create insurmountable burdens on political participation; laws that deny "neither the right to vote, nor the right to appear on the ballot, nor the right to form or associate in a political organization" usually don't make the cut. *Alcorn*, 826 F.3d at 717.

"sufficiently weighty" to justify the burdens imposed? *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997) (quotation marks omitted).

A.

To find our answer, we start by assessing "the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. There are several considerations at this step: Can the rule fairly be described as "neutral," or does it instead "favor one political party . . . over another?" What is its "practical operation" and effect? And are there any "related precedents that shed light on the burden [it] impose[s]?" *Fusaro v. Cogan*, 930 F.3d 241, 259 (4th Cir. 2019) (citing *Alcorn*, 826 F.3d at 713; *Greidinger v. Davis*, 988 F.2d 1344, 1352–54 (4th Cir. 1993)).

Unlike some other ballot-order schemes, West Virginia's doesn't explicitly assign top billing to candidates of any specific political party. *Cf. Graves v. McElderry*, 946 F. Supp. 1569, 1582 (W.D. Okla. 1996) (striking down Oklahoma statute mandating that Democrats always be listed first). Instead, the statute ties placement to a party's degree of success in the most recent presidential election. W. Va. Code § 3-6-2(c)(3). That means— at least in theory—that any party has a shot at obtaining a favored position for its candidates. And indeed, the statute has advantaged both Democrats and Republicans over the years (albeit in two distinct eras, with zero back-and-forth). Maj. Op. at 6.

But in practice, the ballot-order statute functions as a kind of super-incumbency rule that favors candidates of one party over all others. Whichever party garners the most votes for President reaps the benefits of the primacy effect up and down the ballot for four years. And because West Virginia holds elections for many offices every *two* years, the potential

29

for entrenchment is real—the winning party benefits for at least two cycles; likely more, given how infrequently the state's political winds change.[4]

Viewed through that practical lens, West Virginia's statute strikes me as less like the law we upheld in *Alcorn*—which assigned major and minor parties to respective "tiers," but randomly ordered the parties within those tiers—and more like the various "incumbent-first" mechanisms that our sister circuits have held unconstitutional in the past. *See, e.g.*, *McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) (holding North Dakota's "incumbent first" statute violated the Fourteenth Amendment and collecting similar cases); *Sangmeister v. Woodard*, 565 F.2d 460, 468 (7th Cir. 1977) ("This court will not accept a procedure that invariably awards the first position on the ballot to the County Clerk's party, the incumbent's party, or the 'majority' party." (citation omitted)). And in that sense, I agree with the district court that West Virginia's statute imposes a "politically discriminatory" burden, even as it appears facially neutral. *Nelson*, 477 F. Supp. 3d at 503–04.[5]

What about the "magnitude" of the burden? At trial, both sides put on experts who testified as to the frequency and size of the primacy effect in West Virginia elections. The district court found Plaintiffs' expert—Dr. Jon A. Krosnick—to be eminently credible. And it adopted his findings that the primacy effect (1) is highly likely (an 80–85% chance) to

---

[4] *Nelson*, 477 F. Supp. 3d at 504 n.7 ("[T]he Ballot Order Statute has kept Republican candidates at the top of ballots for the past twenty years without interruption.").

[5] *See also Akins v. Sec. of State*, 904 A.2d 702, 707 (N.H. 2006) ("The ordering of parties on a ballot based upon votes in the prior election . . . [is] not [a] 'reasonable, nondiscriminatory restriction[].'").

occur in any given election and (2) endows first-listed candidates with an average "bump" of 2.94 percentage points, such that "the outcome of every [two-candidate] election in which the first-listed candidate won by a margin of less than 5.88 percentage points would have been different if the other major party had been listed first instead."[6] *Id.* at 508.

This windfall is "*frequently outcome-determinative and has a dramatic aggregate effect on West Virginia's political landscape*"—Dr. Krosnick identified *at least* 105 races, and probably more, in West Virginia between 1960 and 2018 whose results "would likely have changed if the order of major-party candidates had been flipped."[7] *Id.* at 508–09 (emphasis added). Those elections included significant state-wide races, including those for President, U.S. Senator, U.S. Representative, Secretary of State, and Attorney General. *Id.* at 508. And they also included make-or-break contests for control of the state legislature.[8] Nothing to scoff at.

---

[6] The State does not contend that these findings are clearly erroneous.

[7] As the majority acknowledges, Dr. Krosnick's 105-race figure likely undersells the true number of elections that, but for ballot order, would have had different outcomes. That's because it is based on an initial primacy-effect calculation of 2.425 percentage points, which was later revised upward to 2.94 percentage points; relies on an *average* measure, and therefore fails to capture races in which a larger primacy effect contributed a larger margin of victory; and doesn't include contests for governor or races otherwise outside of Dr. Krosnick's dataset. Joint Appendix 593, 953–54, 1151.

[8] For example, in 2014, three races for West Virginia Senate were decided by margins of less than 5.88 percentage points. Republicans—listed first on the ballot—won all three, thereby shifting control of the closely divided chamber to their party. Had those elections gone the other way, Democrats would have retained the majority. Joint Appendix 830–31, 1312; Response Br. at 8 n.33.

With due regard to my colleagues in the majority, this impact cannot be dismissed as "modest." To get there, the majority opinion leans heavily on our decision in *Alcorn*, in effect elevating it from a merely "related precedent," *Fusaro*, 930 F.3d at 259, to one that controls our view of this case's unique facts. Maj. Op. at 23–25. For several reasons, I think that reliance is misplaced.

For starters, the three-tiered system at issue in *Alcorn* was fundamentally different than the system at hand.[9] True, a candidate's ballot position depended on their party achieving some degree of success in a prior election. But the threshold for gaining entry to the "first tier"—and therefore having an evenhanded chance to garner primacy-effect votes—was relatively easy to satisfy: if *any* of a party's candidates for *any* statewide office got *just 10%* of the vote in *either* of the two preceding election seasons, then all of that party's candidates would be listed in the top ballot section. And within that top tier, all parties had an equal opportunity to be listed first; it was simply luck of the draw. In contrast to that "relaxed regime," *Alcorn*, 826 F.3d at 717, West Virginia requires a party to win the state's presidential vote outright—a hefty task that only one party can accomplish each four-year cycle.[10]

---

[9] *Alcorn* itself appears to acknowledge the difference between a facially neutral, tiered ballot-ordering system (like Virginia's) and one that promotes a single party (like West Virginia's). *See* 826 F.3d at 718 (comparing statutes at issue in *Graves*, 946 F. Supp. at 1582, and *Board of Election Commissioners of Chicago v. Libertarian Party of Illinois*, 591 F.2d 22, 25–27 (7th Cir. 1979)).

[10] I cannot agree with the majority's assertion that "both Democrats and Republicans have an equal opportunity every four years to obtain the most votes in West Virginia for (Continued)

Next, there's the question of how much stock (if any) to put into *Alcorn*'s categorical comments about the primacy effect—that, regardless of circumstances, "[a]ccess to a preferred position on the ballot so that one has an equal chance of attracting the windfall vote is not a constitutional concern." *Id.* at 718–19 (quoting *New Alliance Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 295 (S.D.N.Y. 1994)). Simply put, this language is dictum. *Payne v. Taslimi*, 998 F.3d 648, 654–55 (4th Cir. 2021) ("Dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding." (quotation marks omitted)). That much is evident because, immediately after classifying ballot-order claims as constitutionally "[non]cognizable," we went on to perform an expressly constitutional analysis—weighing the alleged burdens on the plaintiff's First and Fourteenth Amendment rights against the state's asserted interests, in accordance with *Anderson*/*Burdick*. *Alcorn*, 826 F.3d at 719–21. The majority follows a similar approach here. And in doing so, it acknowledges that *Anderson*/*Burdick* is a fact-driven exercise which demands an independent burden analysis in every case.[11] *See* Maj. Op. at 25 n.12 ("[O]ur holding today rests on the record before us including the factual findings made by the district court.").

---

their presidential candidates." Maj. Op. at 24. The undisputed fact is that, by virtue of winning the last election, one party enters the next election with a substantial upper hand.

[11] For instance, the majority emphasizes that "nothing in the record demonstrates . . . that the primacy effect has altered the result of any presidential election in West Virginia" in the time the ballot-order statute has been in effect—the implication being that, if recent elections for President had been closer, its view of the ballot-order statute's constitutionality might have been different. Maj. Op. at 24.

But equally important, I have doubts about our ability to declare that certain kinds of election-related claims are wholly off limits, no matter how large or small a burden they impose. As we've said before, "[a] regulation which imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 n.6 (4th Cir. 1995). And if ballot-order claims are forever deemed to be "[of no] constitutional concern," we will have transformed what is supposed to be an empirical question—How sizable is the burden?—into a purely legal one.

A simple hypothetical illustrates the danger here. What if the average primacy-effect advantage for first-listed candidates in West Virginia was 15 percentage points, such that it was outcome determinative in virtually every election? Would *that* burden still be "modest" by any standard? Surely not. But in its deferential reading of *Alcorn*, the majority treads perilously close to treating the burden imposed by West Virginia's ballot-order statute as "modest" *per se*.

In short, *Alcorn* does not require us to designate the burden here as "most modest." Maj. Op. at 23 (quoting *Alcorn*, 826 F.3d at 717). And an independent "character and magnitude" analysis leads me to the same conclusion as the district court: the ballot-order statute is discriminatory in nature; imposes a burden of "considerable" size; and thereby "systematically advantag[es] one major [political] party over the other." *Nelson*, 477 F. Supp. 3d at 509.

B.

Our second step under the *Anderson*/*Burdick* framework is to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed." *Anderson*, 460 U.S. at 789.

The State says the ballot-order statute serves at least four such interests: it makes ballot preparation easy; it reduces costs, such as those associated with publishing each distinct ballot form; it preserves confidence in elections by reducing voter confusion; and it leads to quicker, more efficient voting (which in turn potentially supports confidence in elections by reducing wait times to vote). Opening Br. at 50–52. We've previously recognized these and similar interests as "important," and I take no issue with the use of that label here. *See Alcorn*, 826 F.3d at 719–20 (state's interests in reducing voter confusion and making voting speedier are "important"); *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 759 (4th Cir. 2010) (states have "important regulatory interests" in "ensuring orderly, fair, and efficient [election] procedures").

However, even accepting that the interests articulated here are "important," we must bear in mind "the extent to which those interests make it necessary to burden the plaintiff[s'] rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). And to that end, I note that there are certain significant interests that the state *hasn't* advanced here. For instance, Virginia justified the three-tiered system in *Alcorn*, in part, by highlighting its interest in "reduc[ing] multi-party factionalism and promot[ing] political stability." 826 F.3d at 719. The Supreme Court has described that same interest as "strong" and "unquestionably . . . compelling," *Timmons*, 520 U.S. at 366; *Eu v. S.F. Cnty.*

*Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989). But the State does not argue that it applies here—presumably because, rather than elevating a class of major parties over smaller factions, West Virginia's ballot-order statute preferences a single party over all others. Put differently, West Virginia's statute, unlike Virginia's at issue in *Alcorn*, does nothing to foster the "strong and stable two-party system in this country" that many believe "has contributed enormously to sound and effective government." *Alcorn*, 826 F.3d at 720 (quoting *Davis v. Bandemer*, 478 U.S. 109, 144–45 (1986) (O'Connor, J., concurring)). If anything, this statute *weakens* that system by entrenching one of the two major parties over the other.

Likewise, in *Pavek v. Donald J. Trump for President, Inc.*—another case on which West Virginia relies—the state came forward with substantial interests that could not have been presented here. 967 F.3d 905 (8th Cir. 2020) (per curiam). There, Minnesota's ballot-ordering statute was the inverse of West Virginia's—the *worse* a party did in the last general election, the higher its ballot placement. *Id.* at 906 (citing Minn. Stat. Ann. § 204D.13). Accordingly, the state argued that any primacy-effect burden the statute created was justified by its interests in "(1) encouraging political diversity; (2) countering the 'incumbent' effect; and (3) discouraging sustained single-party rule." *Id.* at 908. The Eighth Circuit found those interests weighty. But again, West Virginia does not and cannot rely on such interests—its statute works the exact *opposite effect* as Minnesota's. That is, West Virginia's statute does nothing to "discourag[e] sustained single-party rule," *id.* at 908—rather, it *encourages* it.

36

C.

That brings us to the final step: balancing the burdens and interests detailed above. *Pisano v. Strach*, 743 F.3d 927, 932–33 (4th Cir. 2014).

Whether West Virginia's "important" interests are "sufficiently weighty" to account for the ballot-order statute's effect is admittedly a close call. Outside the realm of strict scrutiny, *Anderson*/*Burdick* does not require a state to employ the least restrictive means to advance its interests. But the ballot-order statute puts a considerable thumb on the scale for a single political party. Notably, even as they upheld Virginia and Minnesota's ballot-order statutes, the courts in both *Alcorn* and *Pavek* appeared to cast rules similar to West Virginia's in a negative light. *See Alcorn*, 826 F.3d at 713 ("[Virginia's law] *does not entrench particular political parties in favorable positions on the election ballot*" (emphasis added)); *Pavek*, 967 F.3d at 908 ("[b]y design, [Minnesota's statute] *cannot advantage the state's predominant party*" (emphasis added)). And the record suggests that alternative ballot-ordering mechanisms (like drawing order by lot or rotating positions across ballots) are feasible and likely to mitigate the problem here without disturbing West Virginia's ability to conduct orderly, efficient, and cost-effective elections.[12]

In the end, the interests articulated by the State simply do not justify the substantial burdens imposed by the statute. To accept the existence of the primacy effect is to accept the psychological reality that voters can be swayed by a candidate's *ballot position alone*.

---

[12] *Nelson*, 477 F. Supp. 3d at 499–500 ("[T]he parties have stipulated that the kind of randomized or rotational ballot ordering that the plaintiffs seek to cure the harm of the Ballot Order Statute is possible with West Virginia's current voting systems.").

I wish that weren't the case. But it appears that it is. According to the district court's findings, the primacy effect is significant—there is a real likelihood that it affects the outcome of close races in West Virginia. And the ballot-order statute wholly allocates the benefit of that effect to one major political party at the other's expense. The State's interests, while "important," cannot justify that considerable burden. Because my colleagues reach the opposite conclusion, I respectfully dissent.